IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 13-cv-02802-LTB

DAVID A. BROOKS,

   Plaintiff,
v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

   Defendant.
_____

ORDER
_____

   Plaintiff, David Brooks, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral arguments will not materially aid in the resolution of this appeal. After consideration of the parties' briefs, as well as the administrative record, I AFFIRM the SSA Commissioner's final order.

## I. STATEMENT OF THE CASE

   Plaintiff seeks judicial review of the Commissioner's decision denying his December 2010 application for Social Security disability insurance benefits, claiming he became disabled on September 15, 2008. [Administrative Record ("AR") 137-38] The application was initially denied at the administrative level. [AR 70-72] An Administrative Law Judge ("ALJ") subsequently conducted a hearing on July 12, 2012, and issued a written ruling on July 24, 2012, denying Plaintiff's application on the basis that Plaintiff was not disabled because he was

capable of performing his past relevant work as a baker (Step Four). [AR 37-57, 20-30] On August 15, 2013, the SSA Appeals Council denied Plaintiff's request for reconsideration, making the denial final for the purpose of judicial review. [AR 1] Plaintiff timely filed his complaint with this court seeking review of the SSA Commissioner's final decision.

## II. FACTS

Plaintiff was born on July 8, 1960, and was 51 years old on the date he was last insured (on December 31, 2011) and was 52 years old at the time of the ALJ's decision. [AR 40, 137, 145] He testified that he obtained a twelfth grade education. [AR 40, 197] His prior work history consists of: cabinet maker/installer, furnace and air condidioning (HVAC) installer, and a baker at a grocery store. [AR 171-76] Plaintiff alleges that he became disabled on September 15, 2008. [AR 20, 137]

The medical records reveal that Plaintiff has a history of epilepsy since childhood, as well as low back pain and high blood pressure. [AR 290]

Prior to his alleged onset date, in March and April 2007, Plaintiff experienced two epileptic seizures during which he suffered injuries. [AR 271] In December of 2007, it appears Plaintiff was not compliant with his anti-seizure medication (Dilantan) and his anti-hypertension medication. [AR 267-71] Plaintiff's Dilantin was lower than therapeutic range when it was measured on July 18, 2008. [AR 267] On July 30, 2008, Plaintiff suffered a tonic-clonic seizure at work and was taken to the emergency room at Exempla St. Joseph Hospital. [AR 254-62] Plaintiff admitted to alcohol abuse and non-compliance with his medications. [AR 254] His Dilantan was again measured below therapeutic range. [AR 255, 267] At his follow-up with his treating physician assessed "seizure disorder related to alcoholism." [AR 267]

After his alleged onset date, Plaintiff suffered another seizure on June 9, 2010, and received treatment in the emergency room at the University of Colorado Hospital. [AR 240-47] At that time Plaintiff admitted to daily alcohol use and Dilantin non-compliance.  The diagnositic impressions of Kristen Nordenholtz M.D., the attending physician, was alcohol withdrawal seizure with sub-therapudic anti-convulsant medication. [AR 240]  A CT scan of his head, to establish the cause of a headache, was normal. [AR 239]  Plaintiff was advised to take Dilantin for seizures and Tranxene to avoid withdrawal from alcohol cessation. [AR 240-47]

Thereafter, on July 12, 2010, Plaintiff established care at University of Colorado Hospital Neurology Clinic. [AR 236-38]  At that time Plaintiff told Laurence Williams, M.D. that he was noncompliant with his medications, that he had a problem with alcohol, and his wife no longer let him drink during the week. [AR 236]  Plaintiff's Dilantin level was excessively high at this visit. [AR 249]  Dr. Williams noted that Plaintiff's alcohol was "likely a factor [in his seizures] but clearly not the whole story" based on his family history. [AR 238]  Dr. Williams' assessment was:  benign essential hypertension; seizure disorder; and alcohol abuse. [AR 237]

During his next office visit on August 9, 2010, Plaintiff advised Dr. Williams he was drinking 2 beers a day, and that he was willing to stop but needed something to treat the shakes that typically last 2-3 days with alcohol cessation. [AR 234]  Dr. Williams noted that he believed alcohol "hasn't brought on [the] seizures – that is a separate issue."  [AR 234]  On August 30, 2010, Plaintiff reported to Dr. Williams that he had stopped drinking, and he continued to take extended release Dilantin. [AR 230]  When Plaintiff returned to Dr. Williams on September 20, 2010, he advised him that he had generally been abstaining from alcohol. [AR 228]

Plaintiff then saw Laura Strom, M.D., for an evaluation on October 8, 2010, where he reported 3 to 4 seizures per year for the past few years. [AR 225-26] Plaintiff reported drinking only on the weekends, but Dr. Strom noted that it was unclear as to how much. [AR 226] Her examination of Plaintiff found a full range of motion in Plaintiff's back, but some limitation in the lumbar spine due to pain with "palpable tenderness in the lumbar region, left greater than right." [AR 226] A sensory exam was intact, except a pattern at L4 and L5 where there was some subjective decrease in pinprick. [AR 227] Gait testing was normal except Plaintiff had difficulty with tandem gait and stabilized himself by using handholds. [AR 227] EEG testing was normal. [AR 224-27] Dr. Strom added Lamictal/Lamotringine to his Dilantin to control Plaintiff's seizures. [AR 227]

On November 17, 2010, Plaintiff was seen by a nurse practitioner, Carol Hennessy, in Neurology at the University of Colorado Hospital. [AR 221-22] Her impression was generalized tonic-clonic seizures, with no breakthrough seizures since September, and a slow transition from Dilantin to Lamictal. [AR 221] Her neurological evaluation showed he was alert, oriented and had normal, spontaneous speech, with a somewhat depressed mood. [AR 221] Plaintiff had several missed steps on tandem walking. [AR 222] An EEG was normal with no evidence of epileptiform activity. [AR 222]

During his February 16, 2011 visit with Ms. Hennessy, Plaintiff reported having a seizure on January 13, 2011, after he had stopped taking the Dilantan on his own. [AR 284] At that visit Plaintiff reported a little dizziness and some blurred vision. [AR 284] He also reported drinking 2 beers on both Saturday and Sunday. [AR 284] Ms. Hennessy reported that he was pleasanly cooperative and was in no acute distress, but had a somewhat depressed affect. [AR 284] He

4

showed a slightly wide-based gait with some veering side to side, especially on turning, and was completely unable to tandem walk. [AR 285]

On February 11, 2011, Stuart Lerman, M.D., a nonexamining physician with the State agency, reviewed Plaintiff's medical records and opined that he had a severe primary impairment of epilepsy, but no medically determinable impairment related to his low back pain as there was no objective medical evidence of such impairment. [AR 58-68] He further opined that Plaintiff had the RFC for medium work, with additional postural and environmental limitations due to seizure precautions. [AR 60-61]

During his next visit with Ms. Hennessy on April 13, 2011, Plaintiff continued to transition off Dilantin and to Lamictal. [AR 282] His primary complaint at this visit was chronic back pain that was getting worse, but he had not followed up with any testing or treatment. [AR 282-83] Physical examination revealed a somewhat depressed appearing man who was again noted to have finger-to-nose testing slower on the left than on the right and difficulty with tandem gait. [AR 282-83]

Plaintiff suffered a generalized tonic-clonic seizure on July 15, 2011 – his first in 7-8 months – without obvious precipitant. [AR 280] Ms. Hennessy suggested switching from Lamictal (as the generic form of the drug) to Lamotrigine (the brand name) and increasing the dosage. [AR 280] During his follow-up visit on August 24, 2011, Ms. Hennessy noted Plaintiff's transition to Lamotrigine, and that his breakthrough seizure in mid-July without clear cause was his only seizure after stopping the Dilantin. [AR 275] She noted that Plaintiff was "understandably depressed" due to a family tragedy, and was experiencing sleep disturbances and dysphoric mood but was negative for suicidal ideation. [AR 275] She noted that Plaintiff

had gone on a drinking binge the previous night, which was unusual for him as he had limited his alcohol intake to a few beers on weekends for quite some time. He continued not to drive, but "works around the house and stays busy." [AR 275-76]

Ms. Hennessy wrote a letter to Plaintiff's attorney, dated October 27, 2011, in which she indicated that he "has epilepsy with breakthough gneralized tonic-clonic seizures occurring several times a year." [AR 288] And, "[d]espite evidence of compliance with medication as indicated by serum lamotrigine levels, he continues to have break-though seizures. He has had 4 this year. This most recent one was in Spetember [of 2011]. These seizures occur without warning and result in loss of consciousness with fall." [AR 288] In addition, she noted that he "has not been able to work since being under our care [and ] he does not drive due to his seizures." She indicated that they will contiue to work with him, "but it is not possible to say whether he will achieve seizure freedom." [AR 288] The date that Plaintiff was last insured was December 31, 2011.

Plaintiff saw Ms. Hennessy on March 21, 2012, when he completed the transition to Lamotrigine and reported being seizure free since October 2011. [AR 290] At that visit Plaintiff reported situational increased alcohol use over the summer, but that his alcohol consumption was again restricted to four beers on the weekend. He also reported insomnia (if he took Lamotrigine less than 3 hours from bedtime), occasional lightheadness when standing up too quickly and one episode of falling against a wall with facial bruising while walking. [AR 290] He continued to experience low back pain with radiation down his hip and lateral leg into his foot described as throbbing aching pain. The pain was better with sitting/lying down and worse with walking, thus limiting his activities. He indicated that the pain started years ago and had no acute cause. [AR

290] He denied depression and was still not driving. His exams were normal. [AR 291]

On March 30, 2012, Plaintiff underwent a CT scan of the lumbar spine due to low back pain, radiating to left leg. [AR 304-05] On April 2, 2012, Mark Miedema, M.D., with Spine and Rehab at the University of Colorado Hospital examined Plaintiff who reported constant pain at a level of 5/10 that was described as an achiness with sharp pain down the leg with numbness and tingling. [AR 292-96] His exam revealed diffuse lower back tenderness to palpation. [AR 295] Dr. Medina assessed lumbar stenosis, lumbar spondylosis and radicular pain. [AR 292] Dr. Medina summarized the CT scan report as follows: "Multilevel degenerative findings, greatest at L5-S1, with severe spinal canal narrowing and severe left greater than right foraminal narrowing. Multilevel moderate to severe foraminal narrowing, as above." [AR 296]

On April 17, 2012, Plaintiff went to the emergency room at University of Colorado Hospital. [AR 296] Plaintiff reported suffering a prolonged seizure after working out in his yard and on his car all day, with several drinks, and forgetting his daily dose of anti-seizure medicine. [AR 296-97] The seizure resulted in loss of consciousness, rhythmic jerking, and he bit his tongue. [AR 297] He suffered a headache, difficulty walking and superficial abrasions on the left side of his face and a tongue abrasion. A CT scan was negative. [AR 298]

During his next office visit with Ms. Hennessy on June 2, 2012, her neurological evaluation was positive for generalized seizure. [AR 299-301] Ms. Hennessy indicated while Plaintiff had used excessive alcohol in the past, his current intake of 2 beers on weekend days was reasonable as his seizures are not usually provoked by this. [AR 299] At this visit Plaintiff reported chronic back pain and that he slept in recliner due to his pain. [AR 300] Examination revealed a stable antalgic gait, but "difficulty with tadem gait (not new)." [AR 301] Plaintiff

reported that he could not afford physical therapy, and was not interested in injections or surgery for his pain. [AR 301]

On June 4, 2012, Plaintiff saw William Sullivan, M.D., with Spine and Rehab at the University of Colorado Hospital, who assessed Plaintiff with chronic back pain and spinal stenosis. [AR 301-03] A lumbar exam showed mildly flat lumbar spine and limited extension secondary to pain. [AR 303] Dr. Sullivan noted that physical therapy was not covered by insurance, and Plaintiff was not interested in trying injections or surgery, but instead wanted pain medication. [AR 301] Dr. Sullivan noted that Plaintiff seemed "very flat/frustrated today" and he should "consider other options regarding chronic pain psych." [AR 301]

Although it is not specifically stated on the record, it appears that Plaintiff suffered a seizure when attempting to take the oath at the commencement of his administrative hearing on July 12, 2012. [AR 37-40] The hearing went off the record for an undocumented period of time. [AR 40] After coming back on the record, Plaintiff testified that he was taking his medications regularly, but suffered a seizure "like every other month." [AR 41] He testified that he was only drinking 2 beers a week under his wife's supervision. [AR 46] He further indicated, upon examination by his attorney, that he had a seizure today and then a week previously as well. [AR 51]

Plaintiff also testified that his back pain prevented him from working, which has gotten a "little worse" since 2008, and that he experiences a big sharp pain going down his leg. [AR 42] He testified that he could maybe lift 15 pounds, he could sit 20 minutes and stand maybe 5 minutes at a time. [AR 44-45] He testified that he spends all his time in his recliner watching television or sleeping, and does no chores in the house or yard and does not drive. [AR 45, 52-3]

8

He stated that he has no other problems that prevent him from working other than his seizures and back pain. [AR 46]

### III.  LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II of the Social Security Act which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.§ 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied.  *See* 20 C.F.R. § 404.1520.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  Step Three then assesses whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, the claimant is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevent him from performing work that he has performed in the past.  If the claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(e)&(f).  A claimant bears the burden of proving disability prior to the expiration of his insured status.  *Hawkins v. Chater*, 113 F.3d

1162, 1164 (10th Cir.1997).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Commissioner has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience. *See* 20 C.F.R. § 404.1520(g).

## IV. ALJ's RULING

The ALJ first determined that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2011. [AR 22]  The ALJ then ruled that Plaintiff had not engaged in substantial gainful activity during the period of his alleged onset date of September 15, 2008, through the date of last insured of December 31, 2011(Step One). [AR 22]  The ALJ next determined that though the date late insured, Plaintiff had a severe impairment of seizure disorder and stenosis (which the ALJ apparently inadvertently indicated as "scoliosis") (Step Two). [AR 22]  However, because the ALJ determined that he did not have a impairment or combination of impairments that meets or equals a listed impairment through the date last insured (Step Three), the ALJ went on to assess Plaintiff's RFC. [AR 22-3]

The ALJ then evaluated the evidence and found that Plaintiff retained the RFC to perform work at the medium extertional level, with some limitations. Specifically,  he remained able to lift and carry 50 pounds occasionally and 25 pounds frequently, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in a 8-hour workday, never climb ladders, scaffolds or ropes, and occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps.  In addition, he would have to avoid hazards such as heights, moving machinery, or operation of a motor vehicle (Step Three). [AR 23]  In light of Plaintiff's RFC, the ALJ found that he was

unable to perform his past relevant work as a baker (Step Four). [AR 29]  Thus, the ALJ denied Plaintiff's application because he was not under a disability, as defined by the SSA, at Step Four of the sequential evaluation process. [AR 30]  On review, the Appeals Council "found no reason" to reconsider the ALJ's decision. [AR 1]

## V.  STANDARD OF REVIEW

My review here is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).  My review of the factual findings is to determine whether they "are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion."  *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987)(*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971)).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).  With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  EVALUATION OF RECORD

On appeal, Plaintiff argues that the ALJ erred when evaluating the evidence. Specifically, he argues that the ALJ "mischaracterized" portions of the evidence, resulting in a failure to fully evaluate the record when assessing the severity of his impairments and in determining his RFC.

Plaintiff first challenges the ALJ's determination that the evidence regarding his degenerative lumbar disc disease did not show compromise or impingement of the nerve root or spinal cord. [AR 23, 28]  Plaintiff contends that this finding is in conflict with the objective CT scan results, taken three months after his last insured date on March 30, 2012, which he asserts reveals extensive nerve root impingement and compromise. [AR 304-05]

First, it appears that Plaintiff is not challenging the ALJ's ruling that Plaintiff's stenosis/ degenerative disc disease did not meet or medically equal a listing requirement (Listing 1.04) which would, in turn, mandate a determination of presumptive disability at Step Two of the sequential process.  Rather, he assert that the ALJ failed to assess his stenosis in combination with his seizure disorder at Step Three.   I agree with the Commissioner, however that Plaintiff's combined impairments together do not equal a listed impairment as required by 20 C.F.R. 404.1526, in that at the time of last date of insured Plaintiff's medical records contain no objective evidence of degenerative disc disease beyond his limited complaints of pain to his medical providers.  *See generally Clover v. Colvin*, 2014 WL 2003038, FN6 (W.D. Okla. 2014) (unpublished)(noting that the claimant bears the burden of establishing that she suffers from a disorder of the spine in order to meet or equal Listing §1.04).

To the extent Plaintiff contends that the ALJ erred when discounting of the extent of his back pain when assessing his physical ability to perform medium work as part of his RFC, I find that the ALJ's findings are supported by substantial evidence. When indicating his functional abilities, the ALJ noted that Plaintiff testified that he "could not lift much, he could sit for may 20-40 minutes or so, and could stand only 5." [AR 24] He further testified that he "just sits in his recliner all day watching television and does not do chores, he does not drive, he waits for his wife to get home and cook something for his, though he can make sandwiches." [AR 24] Plaintiff indicated that his back hurts so bad that '"he cannot even get out the recliner" and he "alleged having pain all day, all the time, all week." [AR 24, 25]

With regard to his described daily activities – as reported in his Function Report submitted to the SSA dated January 7, 2011 – he indicates that "he had no problem bathing and dressing, though he noted he shouldn't stand up in the bath tub, he could fix himself something simple to eat, do laundry, clean, go outdoors for the mail, he and his wife go grocery shopping and he waits in the car. He could handle money . . . [and h]e visits with people on the telephone regularly." [AR 25, 184-94] The ALJ noted that the physical and mental capabilities required for these household tasks and social interactions replicate those necessary for obtaining and maintaining employment. [AR 25] The ALj also indicated that Plaintiff reports to his healthcare providers that he is active around the house. [AR 27]

While it is Plaintiff's position that his back hurt in the form of "a big sharp pain and always radiated down his leg" and that it "has worsened since 2008," the ALJ noted that he "does not get any prescribed medication for his back pain." [AR 24] When assessing the medical records, the ALJ noted the mainly normal physical examination results. [AR 27-28] The

13

ALJ indicated that Plaintiff "mentioned his back pain [during] the April 13, 2011 visit, but had not followed up on testing or treatment" and on March 21, 2012 he complained of sciatica pain "with radiation down his lateral leg into his foot, better with sitting or lying down, worse with walking." [AR 27] With regard to the lumbar CT scan, the ALJ noted the degenerative narrowing at three areas, but determined that "[t]here was no evidence of nerve root impingement or compromise." [AR 28] Then, on April 2, 2012, Plaintiff complained of constant pain (5/10) that was "an achiness with sharp pain down the leg with numbness and tingling" and, upon exam, he "had tenderness to palpation diffusely in the lumbar and thoracic paraspinals [but n]evertheless he had full active lumbar range of motion, negative straight leg raise tests bilaterally, and full and equal lower limb strength." [AR 28] The ALJ noted that two weeks later, he had a seizure while "he had been out working in the yard and on his car all day with several drinks . . . and did not take his seizure medication." The ALJ noted that his ability to work outdoors and on his car all day while drinking alcohol does not suggest or support a claim for disabling pain. [AR 28] Finally, the ALJ noted that Plaintiff again complained of back pain during a visit in June 2012, but that he could not pay for physical therapy, and he was not interested in injections or surgery, but instead "wanted opioid medication." [AR 25] Examination at that time revealed "full lumbar flexion and limited lumbar extnetion sceondary to pain [and h]is lower extremity strength was full and equal." [AR 28]

     As such, even if the the ALJs' determination that "there was no evidence of nerve root impingement or compromise" when assessing Plaintiff' lumbar CT scan results was inaccurate, it is clear that his assessment of Plaintiff's physical ability to work – in the form of his RFC assessment – was based upon substantial evidence and, as such, are conclusive as I may not re-

weigh the evidence.

In addition, Plaintiff takes issue with the ALJ's findings related to his seizure disorder. He first challenges the ALJ's finding that his doctors have suggested "that the seizures may be pseudo-seizures related to alcohol use." [AR 25]   Plaintiff contends that while this observation was contained in medical records prior to his alleged onset date, the medical records after September of 2008 are replete with references to his voluntary reduced alcohol consumption which was, ultimately, deemed "reasonable" by Ms. Hennessy.  Moreover, although Dr. Williams noted that his alcohol use was "likely a factor" in his seizure, is was not clearly the whole story. [AR 238]  Plaintiff also contends that the ALJ improperly found a "history of non-compliance with his anti-seizure medications" based on his Dilantin levels, which he asserts was actually consistent with his prolonged transition from Dilantan to a new medication (Lamital/ Lamotringine).  [AR 29]

My review of the record, however, finds sufficient evidence to support the ALJ's findings related to Plaintiff's alcohol use and his noncompliance with his anti-seizure medications, as well as how they relate to his ongoing break-through seizures.  While the record is clear that he was working with his medical providers to limit his alcohol consumption and to comply with taking his medications, as discussed above, it is likewise clear that his inability to do so at times impacted and was a factor in his seizure disorder.  As such, I find no error in the ALJ's reliance on evidence of Plaintiff's alcohol use and medication noncompliance when determining his RFC.

Plaintiff also maintains that the ALJ failed to address the "repeated references" in the record to Plaintiff's depression.  Plaintiff refers to various notes by his medical providers that he presented "a little upset" or appeared with a "depressed affect." [AR 168, 226, 221, 275, 283,

284, 291] The ALJ's "failure" to address Plaintiff's alleged depression, based on this record, does not constitute error. I first note that when specifically asked, at the hearing, Plaintiff indicated that his seizures and his lower back pain were the only things that prevented him from working. [AR 46] In addition, the record is completely devoid of any diagnosis or treatment for depression or other mental health impairment. More importantly, when reviewing the record as a whole, it is clear that the minor references to Plaintiff's presentation or mood as depressed were minimal at best, and certainly did not rise to the level of consideration by the ALJ.

Finally, Plaintiff claims that the ALJ's characterization that his past work reveals "a pattern of irregular work activity" is inaccurate and his earning records shows strong and consistent earnings beginning in 1980 – at age 19 – and continuing through his alleged onset date in 2008 with only 2 of 29 years showing no earnings. [AR 25, 143-44, 171, 206208] My review of the record, however, reveals more than sufficient evidence to support a pattern of irregular work activity based on Plaintiff's uneven pattern of earnings, as well as his short term tenure at each of his past jobs. [AR 139] *See Simmons v. Barnhart,* 327 F.Supp.2d 1308, 1314 (D. Kan. 2004)(consideration of claimant's work history was proper).

## VII.  WEIGHING OPINION EVIDENCE

Plaintiff also contends that the ALJ erred when weighing the opinion evidence in the process of determining his RFC as required by 20 C.F.R. § 404.1527(c).

He first takes issue with the ALJ's decision to give "no special significance" to a narrative report, in a letter dated October 27, 2011, from Plaintiff's treating provider Nurse Practitioner Carol Hennessy. [AR 288] That narrative assessment indicated that Plaintiff suffered from epilepsy, for the past four years, with breakthrough generalized tonic-clonic

seizures despite his compliance with medication. Ms. Hennessy noted that his seizures occur without warning and result in the loss of consciousness with falls. The ALJ gave this report "no special significance" on the basis that it was brief, conclusory, and inconsistent with the evidence of otherwise normal healthy functioning and good activity levels. [AR 29]

Initially, I note that Ms. Hennessy did not give an opinion as to Plaintiff's ability to work, or restrictions on the type of work he can do, but rather only indicated that he has not been able to work since being under her care. [AR 288] Moreover, as noted by the ALJ, "[f]our seizures in 10 months may prevent a person from lawfully driving but would not preclude a person from engaging in basic work activities." [AR 29] As such, I disagree with Plaintiff's claim that the ALJ improperly rejected Ms. Hennessy's "restrictions" concerning Plaintiff's break-through seizures. [AR 288] Furthermore, to the extent that Ms. Hennessy's letter could be read as her opinion that Plaintiff was unable to work due to his seizures, the ALJ properly ruled that whether a claimant is unable to work is a determination reserved for the SSA Commissioner. *See* 20 C.F.R. §404.1527(d)(1)(indicating that an opinion that a claimant is disabled, is not a medical opinion, but is an issue reserved to the Commissioner).

Plaintiff also challenges the ALJ's reliance on the opinion evidence provided by the non-examining state agency medical consultant, Dr. Lerman, as to Plaintiff's physical RFC. [AR 58-65] Specifically, he contends that the ALJ erred in affording "substantial weight" to Dr. Lerman's opinion that he can perform medium work. [AR 29] However, as discussed above, the ALJ's determination that Plaintiff was able to perform medium work was not only supported by Dr. Lerman's opinion, but was supported by the medical records and Plaintiff's activities. I find no error in the ALJ's assessment and reliance on Dr. Lerman's medical opinion as I agree "it was

17

supported by the objective findings of record." [AR 29]  Although Dr. Lerman did not review the CT scan results dated March 2013, the ALJ found that the record evidence was consistent with his opinion.  As such, I find no error in the ALJ's evaluation of the medical opinion evidence.

## VIII.  CREDIBILITY

Finally, I reject Plaintiff's contention that the ALJ's determinations related to his credibility were not supported by the evidence of record.

In his order, the ALJ found that while Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms were not fully persuasive in light of:  the inconsistences in the reports of seizure frequency; the discrepancies between his reported daily activities to the SSA and his health care providers; his history of non-compliance with medications; his continued alcohol use despite the risk of seizure; and his ability to work on his car "all day." [AR 28]  These specific reasons for the ALJ's credibility determination are set forth throughout his order and are sufficiently supported by the record. *See Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)(noting that Courts will not upset an ALJ's credibility determination "when supported by substantial evidence").  To the extent the Plaintiff attempts to explain or discredit the ALJ's reasons, I note that it is the ALJ's job to weigh conflicting evidence and credibility determinations are peculiarly the province of the finder of fact. *Id.*  In this case the ALJ's findings as to credibility are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988).

ACCORDINGLY, I AFFIRM the SSA Commissioner's final order.

Dated: July   21  , 2015, in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE